Our next case, Deutscher Tennis Bund v. ATPTour Inc et al. Good morning. May it please the Court, I am Brad Ruskin of Proskauer Rose for Defendant Appellant ATPTour, a Delaware non-stock corporation. If I may reserve two minutes for rebuttal, please. Brad? Can I just ask, get some factual points out of the way or questions? This was, by law, was adopted in what, October of 06, November? Your Honor, so initially the bylaw was approved by the Board in a 6-1 vote in concept in August of 2006. In October of 2006, the Board voted on the particular language and voted in favor of the language 7-0, including the representatives of each of the QTF and of the DTB, the European tournament representative on the tour and the international tournament representative on the tour. And at this, when did you first have an inkling, no, actually before I ask that, when you go back to the bylaw, the form of bylaws put out in the spring of 07, for some reason, did not include this particular change to Article 23-3. Is that correct? Well, Your Honor, two separate things. One, the way the ATP provides information to its members, the primary way, is that all information is provided online. All of the bylaws are online. All of the members have access to that. The Board summaries of Board minutes are included online. And in November of 2006, the bylaws, including the amendment to Article 23, the new Article 23, was put online and was fully developed. For some reason, the hard copy that went out, including an error, but in terms of actual notice here, there is no issue. We know, for example, that in February of 2007, counsel to the parties provided a hard copy of the bylaws to its client. And we know that when they filed the complaint on March 28th of 2007, in paragraph 11 of the initial complaint, they expressly referred to the new Article 23. Article 23 didn't exist beforehand. It didn't address any of this. Judge Sleet said antitrust policy, you're out of here. I mean, assuming you're correct that if we reject the antitrust policy aspect, then this has to go, would have to go back for him to consider all these, you know, Delaware contract law, basically. Is it unconscionable? Was there notice? Is this the kind of thing can be imposed by bylaw? I mean, those are issues that aren't before us, are they? Your Honor, I think the record is clear, and I don't know that there are issues of fact with respect to the fundamental issues there. For example, Judge Sleet... But we review what the district court did, correct? Yes, of course. And we decide whether it was right or wrong. The district court made no findings with respect to the binding nature of the bylaw or whether it's unconscionable or any of that. Other than that, there were some questions that existed with regard to how it was put into place. Right. I'd actually say the district court did one thing more, which was that it started from a fundamentally wrong premise in two ways. One, it said, quote, unquote, there is a heavy presumption or heavy burden presumption against recognizing fee shifting provisions or against these types of awards. And two, it said that there was no bad faith on behalf of the plaintiffs in bringing these cases. Why are you arguing the issue the court decided, i.e., is this contrary to antitrust fee shifting policy such that it's invalid? I'm happy to move right to that, and the answer to that is it is not. The district court erred as a matter of law in seeking to suggest that a contractual fee shifting provision should be barred or, in essence, preempted under these circumstances. First point. Absent some form of express congressional statement of preemption, a Federal statute preempts state law only when Congress has set forth a clear and manifest purpose to completely occupy a field. That is not the case here. The Clayton Act, of course, does allow plaintiffs to seek treble damages and to obtain attorney's fees, but there's nothing that prohibits it. There's no preemption. Is there necessarily conflict preemption with the plaintiff treble damages provision? No, Your Honor, there isn't. And, in fact, what we recognize is parties and their state law have a right to agree to fee shifting provisions, mandatory fee shifting provisions. That's what happened here. Other than Judge Sleet's decision, there is no Federal case concerning the Sherman Act that would apply such a policy. To the contrary, we have the analogous cases under RICO. There are a number of cases, and courts frequently recognize, including the Third Circuit, has recognized that RICO and the Sherman Act have the same type of policy. How do you deal with Byram concrete? What we said in Byram concrete? I'm sorry, Your Honor. How do you deal with what we said in Byram concrete? So, Your Honor, the Byram – thank you. The Byram case did not deal with a contractual fee shifting provision. The Byram case dealt with the inherent power of the court under certain circumstances if there is bad faith on behalf of a plaintiff. But, interestingly, I mean, we could have stopped after saying, in the absence of specific legislative authorization, fees may not be awarded. We could have stopped there, but we didn't. We went on and set our conclusions based on policy considerations. It's well known that a primary objective of the private treble of damaged suits is to provide means for enforcement. This instituting private antitrust actions would be dampened by the threat of assessment of defendant's attorney's fees and other costs as a penalty for failure. Free access to the courts would neither be denied or penalized. I mean, this bylaw provision, in effect, imposes the English system on the plaintiffs and would disincentivize plaintiffs from bringing suit, would it not? So there are a few things in what you just raised, Your Honor, some I think legal and some practical. So on the legal side, let me say that Byram was dealing with federal issues. It questioned the context of whether or not a federal court should use its inherent power. And in that context, it was balancing policy as it sought of some concern, as you just expressed, with the issue of whether or not you apply it vis-a-vis the Sherman Act. On the other hand, there's also a policy recognizing, when you say the English rule or the American rule, we recognize that contract provisions or bylaw provisions that do mandatory fee shifting are presumptively enforceable and have a good policy unto themselves. And so, as a legal matter, in this instance, it isn't balancing the two federal issues, it's balancing a state law consideration, which is different in type. As to the practical piece of what you said. We would be saying, if we went the way Judge Sleet did, we would be saying that federal antitrust policy trumps state contract law. That's correct. And that's not appropriate here in the absence of preemption. In terms of the policy or the chilling part, I would say this, several important elements here. Number one, it is probably right that when parties agree by contract to have some form of fee shifting provision, it necessarily does have some, we could call it chilling, I think really the right word to use, I would suggest, is some ameliorative effect to try to get parties to work together to avoid litigation and see if there are other routes to pursue. And keep in mind that this was a bilateral provision. This is provided in this membership corporation that has to operate a worldwide tennis circuit and that ultimately was adopting a plan that the Third Circuit recognized in strong pro-competitive justifications ultimately in order to advance the sport and to take those steps that could affect all of its members. I never heard the argument made that a fee shifting provision was to get people to work together. I think in this context. It's so onerous that heaven forbid you proceed and under this clause, unless you got full and total relief, you had to pay, the plaintiffs would have to pay for the defendants. No, it's not full and total relief. It substantially achieves the relief sought, is actually the language. That's not what was quoted in the brief. But in fact, it substantially achieves the full result sought. And what it does do, especially when it's bilateral here, this provision said if ATP sues one of its members and it loses, it has to pay the member. It's bilateral. If the member sues ATP and it loses. And so yes, there is some effort to discourage litigation in a membership corporation and make it work together. But I'd also say to the extent that takes the baseline, if you will, and pulls it down a little bit, the added incentive that still exists for a prevailing plaintiff in an antitrust case and to bring an antitrust case, the incentives provided by the Clayton Act for trouble damages and attorneys, still fully exist. And it's still the exact, you know, level above, if you will, the baseline. They have that opportunity. And as they say, the proof is in the proverbial pudding. We know it didn't chill. In fact, three separate parties sued ATP here. When did you first have, when did the ATP first have an inkling that there was a problem with the federations that brought the suit in March of 07? Yeah. So what I would say to you is over the course of 2006, ATP was holding a series of meetings considering this plan and making changes. And it wasn't a matter of these federations specific. In no way was this adopted to affect a specific member. A lot of the members all across ATP. My question is, when did you have, when did the disagreements begin, you say in 06? Well, I would say in 06, a lot of members throughout the organization, a lot of player members, a lot of tournament members were expressing their concerns about the plan, about what, and a lot of plans were being considered. The plan itself, by the way, there's a mistake in DTV's brief. They say that the plan was adopted in 2006. The Brave New World plan was adopted in January of 2007. And the recategorization of the Hamburg event owned by the appellees was not until the middle of 2007. I think it was June. So through that period, Judge Ambrose, a number of the parties, what the plan was going to be was hardly certain. Many options were being considered. And through that period, a lot of the members were expressing their concern. So, you know, all of that was out there. But in terms of this act, certainly this is not a case where, and some cases have this problem, where retroactively after the alleged illegal acts, somebody attempts to adopt the bylaw. This was done prospectively. The act, you know, it was not until January of 07, as I say, that ATP adopted the plan. I would like to turn... 54D2 only is, I mean, what's our standard review? It's abuse of discretion, isn't it? You know, to the extent that there are legal issues and legal mistakes, and I would suggest, for example, applying the federal antitrust laws as a bar, that's a legal mistake. There it's plenary review. And I think Judge Sleet's opinion and our criticisms of it are all plenary in that sense. Well, what you could do is just borrow from Byram by analogy. I mean, so, but in the end, his decision under D2 to award or not to award fees is reviewed by us for abuse of discretion. You know, the reasonableness of the fees, when this case, ideally from our perspective, goes back to Judge Sleet and is any determination on the reasonableness of the fees, so long as he applies the appropriate standards with respect to reasonableness, that is a, that is an abuse of discretion standard. But the absolute denial of fees is a legal matter. Well, there's a case in the First Circuit in 03 that says the courts have inherent equitable powers to award attorneys' fees against the party that's acting in bad faith, vexatiously, wantonly, or for oppressive reasons. The, if the other side has not acted in bad faith but good faith, not vexatiously, not wantonly, and for good reasons, for reasons that were plausible, shouldn't the converse be the case that the court has a lot of discretion? Your Honor, no. Again, that goes to the issue of the reasonableness of the fees. The issue as to whether or not to award fees under a mandatory fee-shifting provision, that issue, and I think it was recognized in the U.S. Fidelity case in the Second Circuit, which was cited by this Court, that issue goes, is a legal issue. Well, yeah. Again, looking at it conversely in the First Circuit case, if a party is acting badly, you can't award fees, not so much the amount of the fees. You can award fees. You can go against the American rule. And that goes back to the inherent power of the Court in those circumstances to allow Court discretion to award the fees. And you're right. That is a discretionary judgment in that instance if they determine bad faith. That goes to the inherent power issues, Your Honor, and I think that's why those cases are distinguishable and different from the situation when you're dealing either with statutory fees or mandatory fee-shifting provisions. I see my time is up. I was going to mention one thing about the state law claims, but if you want me to stop, I... No, I think we'll hear from you on rebuttal. Fair enough. Thank you, Your Honor. May it please the Court. Good morning. I'm Robert McGill. I represent the Qatar Tennis Federation. With me today is my partner, Hamish Cohen, and also representing the German Tennis Federation is Aaron Palmer. The district court decision should be affirmed for any one of four different reasons. First, its rule 54 ruling was correct. It was a use and exercise of its... But Byram, really, the 67 case, didn't involve contractual fee-shifting provisions. I mean, it was an individual trying to bring a public antitrust claim, and one could easily cabinet case or distinguish that case from our case. Moreover, Delaware Supreme Court has had a pretty significant history of allowing private ordering. You see that in the LLC context, et cetera, and why can't parties privately order that, saying, hey, the usual rules aren't going to apply here. The contract that's now in place is that if there is a suit and you lose, you pay. For several reasons. First, federal law reigns supreme here for the very reasons that this court said in 1967... Federal law reigns supreme on the state law issues? You've got four state law issues here. Well, there were state law issues, Your Honor, but the fact of the matter is what this court said in Byram addresses an important legal principle, one that's important, whether it's Delaware or any state in this country, that the antitrust laws of the United States have special meaning and effect that should be enforced under a variety of different circumstances, Sherman Act and Clayton Act. But Byram, we said that as a matter of policy, but I don't know of any case holding preemption by virtue of the antitrust laws, because that's really what you're saying. We can't just say, oh, there's policy here, and that reigns supreme. We need to find a basis for federal law to trump state law. And I know in the FAA, of course, we decide all the time the extent of preemption, where there is preemption. But here, there is no field preemption by virtue of antitrust law. There's not even conflict preemption because there is nothing in the antitrust law about defense fees. So how do you say, I don't know, federal law... And just because we said we had some dicta in Byram, I don't think that is sufficient to announce a preemption policy. So where do you, what is your statement as to the supremacy? What is that based on in the antitrust area? Well, it does come from the supremacy clause from the standpoint of may parties make a private agreement that nullifies the meaning and effect of the antitrust laws. There's no nullification here. Well, the nullification... The plaintiff's treble damages still exist. There is a provision, and if plaintiffs had one here, antitrust law provides for treble damages. It says nothing about defendant's ability to fee shift. Well, let's move for a moment, if we could, to the Ninth Circuit and what it had to say specifically on the subject. In the Ninth Circuit, in the Azizian case, which we provided to the court in our briefs, said the following. Given the policies served by antitrust laws, asymmetrical fee provisions, a district court can only order a losing defendant, the party violating the antitrust laws, to pay attorney's fees. That's at pages 459 and 460 of that Ninth Circuit decision, citing this case. So with respect to the contract that is involved here, there's another dimension that warrants mentioning in this particular context. One, what your district judge found in this particular case as to the issues involved here and how they were litigated. He was in a special position to make a variety of judgments. Here's what he said about this particular case. He said that here, with respect to this antitrust policy, he said specifically the incentive for instituting private antitrust actions would be dampened by the threat of assessment of defendant's attorney's fees as a penalty for failure here. He also found and said, your honors, that allowing corporate antitrust defendants to adopt bylaws that would impose attorney's fees on members, members who unsuccessfully but without bad faith file an antitrust suit would likely have a chilling effect, a chilling effect for the filing of meritorious actions. His findings... Where is the, what Supreme Court case sets forth this principle? The principle, the policy rationales, or the supremacy analysis that we're offering here? Either one. You're saying there's basically a preemption. A preemption, because we have state contract law here. Right. So what says that that isn't the guiding principle? Well there's, I cannot cite to you, your honor, a Supreme Court of the United States decision that says this. But if I think if you take the body of law which this court first established, this Third Circuit established in the Byram case, and it's followed by Azizian and other cases, I think that's the effect and meaning of the decisions. But one, two other things about the... As I said, Byram did not have a contractual fee shifting provision. It did not. And let me mention one other thing, if I may, or two other things, if I may, on the contractual fee shifting provision. And the other problem here is you've got sophisticated corporate parties. I mean this isn't a case of, you know, complete taking advantage of those who have no leverage whatsoever. You have a worldwide organization. The ATP is a not-for-profit organization which has worldwide members. But when the suit was brought in March 28th of 07, regardless whether the hard copy of the bylaws noted the new 23.3, the plaintiffs knew what was being, what would be argued against them at some point. What we had, we had... If they lost. Pardon me? I said if they lost, I'm sorry. Your Honor, in terms of the German Tennis Federation, as counsel, we had those bylaws, but in terms of what was provided, there's some important record evidence that needs to be illuminated here. Number one, in terms of the questions you asked at the beginning of the argument, the ATP had a policy of not distributing minutes of their Board of Directors meetings, a standing policy. All they would give were summaries. Critical here, there are seven dimensions of evidence that the trial court or the district court had. Number one, the district court knew about this policy. Number two, the district court knew that there was no summary, no summary of the minutes of the October 2006 Board meeting that was sent to the members, which this bylaw was purportedly adopted. But the website your opposing counsel said noted in November of 06 that the bylaws had been changed. I don't think that's correct based on the record. And furthermore, with respect to... My initial question was, did your clients know when they filed the suit on March 28th of 07 that there had been a bylaw change relating to fee shifting? We knew, as counsel, we had gotten, gone to the Delaware site, to the Delaware Secretary of State site, and we knew as counsel, for purposes of finding venue, we knew what those bylaws said that were filed with the Secretary of State. But, Your Honor, with respect to two other things, the November 2006 Board summary stated only that the Board confirmed the new language of Article 23, and then, critically, there were three other events. On May 4th of 2007, the ATP filed its first answer and never mentioned the fee claim. May 4th, 2007, the ATP filed its initial disclosures. You don't have a fee claim until the case is over. They had a fee claim that they had a claim for fees that existed as to the fees that had been incurred as of May of 2007. And they had a fee claim that, a fee claim, special damages, under Delaware law, and this circuit's precedent that was given to us in the... But what if you won? They didn't have a fee claim. Agreed. But it's like any claim that must be put. You've got to file your claim so there's notice and opportunity to be heard. If you have... It's not part of your merits cause of action. If you have indemnity or contribution, you don't have to plead it. You plead it after you get a judgment in your, or something in your favor, or, I'm sorry, against you, some type of judgment in that context. Here, don't you, you need a judgment. I don't see how they... But here you need a substantive basis for the claim. You need to plead that you have a bylaw, a contractual right for legal fees that would exist under the terms of the bylaw. You would need to submit that. There's a jury trial right associated with the bylaw itself. Was the bylaw, under these circumstances, appropriately promulgated and set forth? What you're really saying is they needed to put in their answer that, just want to let you know, by the way, if we win, we have a right under 23.3 to seek our fees to be reimbursed to us. They need to file a claim. They need to file a claim and that's what this court, that's precisely what this court said. But that means you have to have a prerequisite, which is they have to win. Well, it's... And you knew this was, I mean, the argument you're making is procedural because you knew when you filed, and obviously you did your job, and there was this possibility, and you decided to take that risk. No problem. But you also know that what's coming down the road, if you lose, they're going to make a claim. Not at all, because we didn't know, Your Honor, for several reasons. Number one, events completely... Would you have bet that they weren't going to make a claim? In June of 2007, in accord with the protocol of the ATP, where all the organizational documents each year are submitted, each year, 2006, 2007, to the worldwide members of the ATP is an official communication. Here are the organizational documents pertaining to the ATP tour. Here they are. June of 2007, they were not included. When the testimony came from a director, defendant, Charles Passerell, at the trial in the presence of the district court and all parties, he was asked to identify Exhibit 1377, the bylaws, not with Article 23. He gave testimony about those very bylaws as well at the pages we've cited in our brief. But that may be a matter for a whole other cause of action after your antitrust case is over. But no district court is going to try that case as part of the trial of an antitrust case. And it's not even relevant until the case is over. Don't decide today what you can decide tomorrow for. Tomorrow it may not need to be decided. And as Judge Amber said, do you have to, if there's an indemnity provision in your contract and you're suing on the contract, do you have to include a, you know, count six, by the way, if we win, they indemnify us? You do. It's a counterclaim. It's a counterclaim that arises out of the transaction or occurrence that's subject to the case. No, it arises out of a different contractual provision, a totally different cause of action than the merits. Well, it arises out of the bylaws, which were a portion of the case. And the bylaws themselves were, at least in one part, were a portion of the case. They had an obligation to plead and respond in relation to the bylaws. And I divert a little bit from that. I'm looking at the promulgation you talked about for prior to the promulgation. This was approved of by the directors, correct, this change? Apparently it was approved of by the directors in October of 2006. Okay, now, the other members of this, did they vote on this? They did not, just the directors. So it was a unilateral decision by the board. It was. And it was not a, no summary of that October 26 was distributed to the members. So it was a decision by the board, not voted on by the other members. That's correct. All right. In the Certificate of Incorporation, is the board empowered to make a unilateral change of this nature? In the Articles of Incorporation, Certificate of Incorporation, excuse me. I, off the top of my head, I don't, I don't, I don't know off the top of my head, Your Honor, whether the certificate allows that, but I do know in terms of Delaware substantive law, that the board is bound by the bylaws it presents to its members. And that's the McKinney case, which we cited. And furthermore, that there's an equitable estoppel associated with any confusing or contradictory information that's provided. And critically, under the Dousman case, and there was no answer by the ATP to the Dousman case, a Delaware 2002 case, which says that access and possession of the bylaws does not bar an estoppel. If I may go back to the initial questions on this bylaw. The bylaw is not valid as a matter of law under the McKinney case, because in June 2007, in the official annual communication by the ATP tour, they did not communicate the bylaws as required. They're bound by the bylaws they handed us, legally. Second, they are equitably estopped from enforcing these bylaws, because the entire history that was provided in relation to these bylaw provisions was, in the language of the Dousman case, confusing and contradictory. And that, as the Dousman case said in its precise terms, quote, access and possession of bylaws does not bar the estoppel. So as a matter of looking at the Byram analysis here, there is no valid contract as a matter of law or equity. Byram holds true here in all respects. And the policy rationales given by this court in Byram apply with full force and effect. Last point, the state law claims were described by the district court in its specific findings, and they were all incidental to and inextricably intertwined with the Sherman Act claim. So that would seem to go to the amount. But let's go back to Judge Nygaard's question. What was the process required under these documents, the Certificate of Incorporation and the bylaws, for bylaw changes to be made? Or do you just look to the Delaware GCL, general corporation law? I believe that you look to the substantive law of Delaware, Your Honor, to determine whether the bylaws have been properly promulgated and distributed. And under that law, these particular bylaws in Article 23 do not meet the requirements in each of the two respects that I mentioned. There is a solemn process in Delaware, as this court knows. I don't have it in front of me, but I thought the GCL was pretty flexible in how it, how it allowed bylaw changes to be made. But they have to be noted in writing somewhere. My guess is it would be in the Certificate of Incorporation. Your Honor, I think that, I think generally speaking, that's my understanding of, in terms of promulgation of bylaws, but in order to carry them forward and have legal effect, there are substantive Delaware requirements that were not met, as has been confirmed by the McKinney case that we've referenced on brief, and the Dousman case on the equitable estoppel basis as well. And for those reasons, Your Honor, as we ask that the district court decisions be affirmed for each of the four reasons mentioned in our report. Let me just ask one. You, you, you, I cut you off, but you were saying that this, how, how long a trial was this? Two weeks. Two weeks. It went into a third week, I believe. Ten, ten full days. It did. And you say of those ten days, what percentage was devoted to antitrust and what percentage to state law claims? From our standpoint, we said it in paragraph four of our complaint, and we, and I think the entire proceedings confirmed that this was an antitrust case, and our state law claims. But of the ten days, roughly how much was devoted to antitrust and how much was devoted to state law claims? In our view, every day of our presentation was antitrust. Antitrust violations were a predicate to each one of our claims. You didn't present the, did you put evidence in on the state law claims? Can I elaborate? On fiduciary duty, for example, the claim was a knowing violation of antitrust laws. Conversion. The antitrust conspiracy converted our property rights. With respect to interference with our contractual relationships for both federations, our principal claim there was that they had interfered by an antitrust conspiracy, and that that was the illegal conduct under that claim. So with respect to those three state law claims, antitrust proof was the core of each of those claims. I can't identify an answer to your question, a particular witness that was presented at trial that was solely related to anything different. Okay. Thank you. Thank you for your time. Mr. Ruskin, could you go to Judge Nygaard's questions relating to the, how the process that existed was in place before October of 06 for the purpose of changing bylaws? Yes, Your Honor. So first, in paragraph 8th of the charter, it provides for and this is at page 94694 of the record. Paragraph 8th of the record? Paragraph, I was giving the wrong number. Paragraph 8th, and I'm having trouble reading the number because the line is crossed through. I'll ask someone to give it to me in a second. But in paragraph. The appendix. Yes. You don't have the page of the appendix there? Your Honor, the appendix number is just crossed through on the copy. I'm going to give it to you, I will get it. But in article 8, it provides that the Board of Directors who have, can amend, shall have no power to make, amend, or repeal bylaws of the corporation in a manner which is inconsistent with action taken by the member of the corporation. It recognizes that it has that power. More to the point here. What were you reading from there? That's from the certificate of incorporation. You want to read that one more time? Can you get the page up on the page for me? Your Honor, they're going to, can you get the page for me? I'm sorry. No problem. No problem. Let me, and then I'll come right back to it. What I wanted to tell you also is, in the bylaws themselves, number one, the bylaws have a voting provision for amendments of the bylaws. Number two, as a condition of membership. The voting provision in the bylaws doesn't require member approval? No, it does not, Your Honor. It requires a specific vote of the Board. It requires a supermajority vote of the Board. Number two, there's a provision, section 3.2, condition of membership, and it expressly provides that they can amend, and as a condition of membership, members must agree to be bound from time to time as there are amendments to the bylaws. Number three, each of these members signed application forms when they joined the TOR, and in those application forms, they agreed to be bound by the bylaws as amended from time to time. And number four, in June of 2005, the parties signed a transfer agreement at the point in time in which QTF purchased 25% of the Homburg event, and that's found at JA5932-33. And there again, yet another time, they expressly agreed to be bound by the bylaws as amended from time to time. So in all these ways, the way this organization has operated for its more than 20 years in existence is fundamentally bylaw amendments and operating in that way. That's how it's made these type of changes, and in this type of membership organization, when these are active members within the organization that have representative government, representatives on the Board, this is how the TOR has always operated. Could you describe the extent of the proceedings before Judge Sleet with respect to this issue? Was it briefing? Was there a hearing? Was there evidence? Your Honor, there was a motion made. I believe it was just a motion with affidavits. I don't believe we had argument on the motion. There was briefing as a matter of law as to the nature of the bylaws, et cetera, et cetera? Yes, as to the right of the fee. The bylaw issue existed throughout the course of the trial. This really ties to the issue that you asked Judge Amber about, the state law claims. There were a series of claims here, including a conversion claim that ATP, under the bylaws, taken away the rights of membership. That was a fundamental claim that was asserted, many of the same facts that existed in the antitrust claims, but that claim was founded on the concept that their membership rights were taken away under the bylaws, and so there was a great deal of testimony that dealt with that subject. You know, I'd say really testimony here sort of fit into three buckets. There was some facts that were to the state law claims alone, and indeed plaintiffs themselves called a number of witnesses, called a number of board members on the fiduciary duty issues and the like. There were most of the facts that were probably relevant to both the antitrust and the state law claims, and then there were other facts that were unique to the state law claims. All of those were part of the case. Part of the reason it's sort of difficult to give a percentage, because many of the facts overlay, and I would say to you that even if one adopted the policy argument that was advocated by Judge Slade and Apelles with respect to the antitrust laws, even if one were to do that, still you would not apply it to any part of the case other than that which was unique to the federal antitrust laws. Your friend across the aisle there referred to a case, and I didn't write it down, I don't know which one it was, that requires something more than was done in order to affect the proper promulgation by proper notice to the other members and that it was not done in this case. Can you enlighten me on that? Your Honor, there was actual notice here, and there's no case suggesting when there's actual notice there's an issue. Again, if you look at paragraph 11 of the complaint at page 3216 of the record, they actually cite from and quote from Article 23. They do it again in the amended complaint after they say they received the wrong document in June by that mistake. The correct document was online, but when they received the wrong copy of the bylaws later on when QTF joins the case in the amended complaint, paragraph 18 of the amended complaint at page 06575 of the joint appendix, also quotes from Article 23. And as I said to you before, Article 23 was a brand new article. It didn't exist before this amendment. It dealt with venue, it dealt with the attorney's case provision. So there's no case suggesting that when you have actual knowledge in that way, and indeed the parties themselves during the course of the case testified that they were well aware that they had read the complaint before it was filed. And then going back to the paragraph 8 that you quoted from your certificate of incorporation, where is that found in the appendix? Do you have that page? It is at page JA03136. 03136. And that is the certificate of incorporation. That is right. And the certificate of incorporation itself, Your Honor, starts at page JA03126. 127? 126. 26 instead of 36. All right. Thank you.  Thank you, Your Honor. If you – even if you were to win, it almost sounds like any victory could be pyrrhic. I mean, you've got Byram, which says that in the absence of specific authorization, attorney's fees may not be awarded to defendants in private antitrust litigation. I realize there's no contractual provision, but if we follow that and then say, well, they didn't consider the state law claims, you then go back to the court and the amount of fees awarded could be far, far, far, far less than what you're requesting. Well, Your Honor, I think if you would suggest correctly conclude that the federal law doesn't preempt here and direct us to go back to the district court, what the district court should do here is apply – Even if federal law doesn't preempt, let's just say what if federal law covers – and the antitrust claims were the large majority of what was dealt with in the 10 days of trial. You could foresee possibly or conjecture that the district court, even if it awarded fees with regard to the state law claims, they may be very small. Your Honor, I don't think – and I would suggest that you should make clear that to the extent we were defending against both the state law claims and the federal claims, even if you were to recognize that policy, the ATP had to defend against those state law claims. The conversion claim here by itself, they sought the same amount of damages. They sought $80 million. On the tortious interference claim, they sought an additional $3.5 million, which ultimately was rejected by the court in an eliminate motion. They sought punitive damages. They sought in the state law claims here an amount that would cripple the ATP and made this a do-or-die case for ATP. Okay. And so to the extent I would say that any of the facts needed to be adduced that overlay both, it should be clear that at most all that should be carved out – and I suggest nothing should be carved out – but at most all that should be carved out were those parts of the case that only related to the antitrust issues. And that, in fact, is a very small amount of the case. And I suggest that in a remand it should be clear there aren't issues of motivation or bad faith. Those aren't issues that go to enforceability of a contract in this context. The issue for the court should be to apply the standard test for reasonableness. Within that framework, the judge has discretion to determine what is reasonable, but he has to apply the appropriate test of reasonableness. You know, I had really thought that this case rose and fell on the antitrust ruling of the court. But I'm looking at the ruling now and he made some pretty strong statements also as to what is before him with respect to the corporate bylaw. It's entirely possible, if we were to send this back on the antitrust piece, he's going to say, well, I said a corporate adopted bylaw, you know, there's no case that says it can form the basis for recovery for members who sue the corporation, much less in actions where the bylaws are not directly at issue. And I also said you can't have attorney's fees based on a bylaw adopted only after they became a member of the corporation. Are you asking us to address all those issues as well? Well, Your Honor, he did say those things. I think the fundamental holding was, as you recognize in reading it through the overarching piece, was the antitrust piece. On the other hand, as I said to you, he did make statements along the way, whether one's called a dictator or otherwise. He wrongly focused on the bad faith, or what he said was the lack of bad faith of plaintiffs in bringing this case. That isn't a factor and isn't supposed to be a factor in mandatory fee-shifting cases. He wrongly said there's a heavy burden against the presumption. That's not correct. Well, that's I'm wondering how much process, because I'm wondering if this goes back and then he says, well, I also said this, that's the law, and then it comes back up again. We'll see. Well, Your Honor, that's why I would actually suggest the remand should be focused on the right issue for him to determine now is just the reasonableness of the case. I think your colleague was right when he said these clauses are in there so people can come to agreement. I think I said that. Oh, you said that. That's right, you did. And I questioned you on it. So I won't disagree with myself, Your Honor. But maybe that's where this should go. All right. Thank you. We'll take the case under advisement. We'd like you to order a transcript of the argument. I think it was very helpful. If you could share the cost of getting a transcript, you can contact the clerk and find out how that's done. It would be of great help to the court. Happy to do so, Your Honor. And thank you very much. Thank you. The case is well argued.